Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Sean Gorton, Esq.
Ashley N. Prinz, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

          Plaintiffs,

   -against-

HAZAQ PSYCHOLOGICAL SERVICES, P.C.,
RESTART PSYCHOLOGICAL SERVICES, P.C.,
GRIGORY ORENBAKH, PH.D., and JOHN DOE
DEFENDANTS "1" – "5",

          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:

**Plaintiffs Demand a Trial
by Jury**

## COMPLAINT

   Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

   1.  This action seeks to recover more than $568,000.00 that the Defendants have

wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of

fraudulent, unlawful, and otherwise non-reimbursable, No-Fault insurance charges for medically unnecessary psychological services, including psychiatric diagnostic evaluations, psychological testing, record reviews, psychotherapy, and biofeedback training (collectively, the "Fraudulent Services"), that purportedly were provided to individuals who claimed to have been involved in automobile accidents and were eligible for coverage under GEICO No-Fault insurance policies ("Insureds").

2.      Defendant Grigory Orenbakh, Ph.D ("Orenbakh") is a psychologist licensed to practice in New York who purports to own a series of psychological professional corporations, including Defendants Hazaq Psychological Services, P.C. ("Hazaq") and Restart Psychological Services, P.C. ("Restart") (collectively, the "PC Defendants"), that have billed GEICO and other New York automobile insurers for the excessive and medically useless Fraudulent Services.  The PC Defendants purport to be legitimate professional corporations, but they operate on a transient basis, maintaining no stand-alone practices, having no patients of their own, and providing no legitimate or medically necessary services.

3.      Orenbakh, along with John Doe Defendants "1"-"5" (collectively, the "John Doe Defendants"), perpetrated the fraudulent scheme using illegal referral and kickback arrangements to permit the PC Defendants to access a steady stream of patients, fraudulently bill GEICO, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

4.      GEICO seeks to recover monies wrongfully obtained from it and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $160,000.00 in pending No-Fault insurance claims that have been submitted by or on behalf of the PC Defendants because:

(i)    the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of unlawful financial agreements and payments for referrals, that were established between Orenbakh, the PC Defendants, and the John Doe Defendants;

(ii)    the Fraudulent Services were not medically or psychologically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who were purportedly subjected to them; and

(iii)    the billing codes used by the Defendants for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

5.    The Defendants fall into the following categories:

(i)    Defendant Orenbakh is a psychologist licensed to practice psychology in the State of New York, who purports to own the PC Defendants, and who purportedly performed virtually all of the Fraudulent Services.

(ii)    Defendants Hazaq Psychological Services, P.C. ("Hazaq") and Restart Psychological Services, P.C. ("Restart") are New York psychological professional corporations, through which the Fraudulent Services purportedly were performed and were billed to New York automobile insurance companies, including GEICO.

(iii)    The John Doe Defendants are individuals and/or entities who participated in the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of the PC Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the PC Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

6.    As discussed herein, the Defendants at all relevant times have known that: (i) the Fraudulent Services were not medically necessary and were provided pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of

services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iii) the Fraudulent Services were provided – to the extent they were provided at all – pursuant to illegal kickback arrangements, and payments for referrals amongst the Defendants and others.

7.     As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed to GEICO.

8.     The charts annexed hereto as Exhibits "1" and "2" set forth a representative sample of the fraudulent claims that have been identified to-date that Defendants submitted, or caused to be submitted, to GEICO.

9.     The Defendants' fraudulent scheme began as early as 2019 and has continued uninterrupted through the present day, as the PC Defendants continue to seek collection on pending charges for the Fraudulent Services.

10.     As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $568,000.00.

## THE PARTIES

I.     **Plaintiffs**

11.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal place of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

II.     **Defendants**

12.     Defendant Orenbakh resides in and is a citizen of New York. Orenbakh was licensed to practice psychology in New York on or about August 8, 2001 and serves as the nominal owner of the PC Defendants.

13.     Defendant Hazaq is a New York professional corporation that was incorporated on or about March 27, 2019, with its principal place of business in New York, and purports to be owned and controlled by Orenbakh.  Hazaq has been used by Orenbakh and the John Doe Defendants to submit fraudulent billing to GEICO and other insurers.

14.     Defendant Restart is a New York professional corporation incorporated on or about February 5, 2020, with its principal place of business in New York, and purports to be owned and controlled by Orenbakh.  Restart has been used by Orenbakh and the John Doe Defendants to submit fraudulent billing to GEICO and other insurers.

15.     Upon information and belief, the John Doe Defendants reside in and are citizens of New York.  The John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of the PC Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the PC Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

17.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 over claims being brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

18.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the complaint occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

20.     GEICO underwrites automobile insurance in the State of New York.

I.      **An Overview of New York's No-Fault Laws**

21.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.) (collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

22.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

23.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services.

24.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or more commonly, as

an "NF-3"). Alternatively, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

25.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirement necessary to perform the underlying services.

26.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) provides, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis added).

27.     In New York, only a licensed psychologist may: (i) practice psychology; (ii) own or control a psychology professional corporation; (iii) employ and supervise other psychologists; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychology services.

28.     Unlicensed persons may not: (i) practice psychology; (ii) own or control a psychology professional corporation; (iii) employ and supervise other psychologists; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychology services.

29.     New York Law prohibits licensed healthcare services providers, including psychologists, from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education law §§ 6509-a; 6530(18); and 6531.

30.     New York law prohibits unlicensed persons not authorized to practice a profession, like psychology, from practicing the profession and from sharing the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

31.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate treatment, or it allows unlicensed laypersons to share in the fees for the professional services.

32.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y. 3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

33.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

34.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

35.     Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information

concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

II.   **The Defendants Fraudulent Scheme**

    A.    **Overview of the Scheme**

36.    Beginning in 2019 and continuing through the present day, Orenbakh, the PC Defendants, and the John Doe Defendants (collectively, the "Defendants"), masterminded and implemented a complex fraudulent scheme in which the PC Defendants were used to bill GEICO and other New York automobile insurers hundreds of thousands of dollars for medically unnecessary, illusory, and otherwise non-reimbursable services.

37.    The Fraudulent Services billed under the names of the PC Defendants were not medically or psychologically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

38.    Orenbakh did not operate the PC Defendants at any single, fixed location.

39.    Orenbakh, instead, operated the PC Defendants on an itinerant basis from various "No-Fault" medical clinics, primarily located in Brooklyn and Queens, where the PC Defendants received steady volumes of patients through no efforts of their own, including at the following clinics (collectively, the "Clinics"):

| Clinic Locations | | |
|---|---|---|
| 222-01 Hempstead Avenue | Jamaica | New York |
| 360A West Merrick Road | Valley Stream | New York |
| 513 Church Avenue | Brooklyn | New York |
| 3040 Nostrand Avenue | Brooklyn | New York |
| 4104 Farragut Road | Brooklyn | New York |

40. In order to obtain access to the Clinics' patient base (i.e. Insureds), Orenbakh and the PC Defendants entered into illegal financial and kickback arrangements with the unlicensed persons, who provided access to the patients that were treated, or who purported to be treated, at the Clinics.

41. Orenbakh and the PC Defendants thereafter subjected Insureds at the Clinics to various medically and psychologically unnecessary and illusory healthcare services, including, among other things, patient examinations, psychotherapy, and biofeedback, all solely to maximize profits without regard to genuine patient care.

**B.    The Illegal Kickback and Referral Relationships**

42. As set forth above, psychologists that pay or receive compensation in exchange for patient referrals are not eligible to receive no-fault insurance benefits.

43. Even so, the PC Defendants and Orenbakh illegally compensated the John Doe Defendants, by paying them illegal kickbacks, when the John Doe Defendants would provide them with patient referrals.

44. In order to bill GEICO and other automobile insurers for its services, including patient examinations, psychotherapy, and biofeedback, the PC Defendants needed to obtain patient referrals from other healthcare providers.

45. The PC Defendants had no legitimate indicia. They had no fixed treatment location of any kind, did not maintain stand-alone practices, and were not the owners or leaseholders in any of the real property from which they purported to provide psychological services.

46. Rather, access to the Insureds was obtained through the payment of kickbacks or other financial incentives by the PC Defendants and Orenbakh to the John Doe Defendants – the

medically unlicensed laypersons who controlled, managed, and directed the day-to-day operations of the Clinics.

47.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics, in actuality, were organized to supply convenient, one-stop shops for No-Fault insurance fraud.

48.     The Clinics provided facilities for the PC Defendants, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared toward exploiting New York's No-Fault insurance systems.

49.     In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

50.     For example, GEICO has received billing for purported healthcare services rendered at the clinic located at 222-01 Hempstead Avenue, Jamaica from a "revolving door" of more than 65 purportedly different healthcare providers.

51.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 360A West Merrick Road, Valley Stream from a "revolving door" of more than 55 purportedly different healthcare providers.

52.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 513 Church Avenue, Brooklyn from a "revolving door" of more than 70 purportedly different healthcare providers.

53.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 3040 Nostrand Avenue, Brooklyn from a "revolving door" of more than 20 purportedly different healthcare providers.

54.     In keeping with the fact that unlicensed laypersons controlled many of the Clinics and that the Defendants paid illegal kickbacks in exchange for patient referrals, GEICO has identified in a series of related investigations that a group of unlicensed laypersons combined to misappropriate and illegally use the name, New York license, signature and other relevant information of physicians based out of Maryland, New York and Missouri to bill GEICO for services purportedly performed at, among other locations, 222-01 Hempstead Avenue, Jamaica; 360A West Merrick Road, Valley Stream; and 4104 Farragut Road, Brooklyn. See Gov't Emples. Ins. Co., et al. v. Gary Grody a/k/a Lance Grody, et al., Dkt. No. 22-cv-03598 (BMC)(E.D.N.Y.) and Gov't Emples. Ins. Co., et al. v. Gary Grody a/k/a Lance Grody, et al., Dkt. No. 22-cv-06187(KAM)(PK) (E.D.N.Y.).

55.     Orenbakh had no genuine doctor-patient relationship with the Insureds that visited the Clinics, as the patients had no scheduled appointments with Orenbakh or the PC Defendants.

56.     Orenbakh, in order to obtain access to the Clinics' patient base (i.e. Insureds), entered into illegal financial arrangements with unlicensed persons, including the John Doe Defendants, who "brokered" or "controlled" patients that were treated, or who purported to be treated, at the Clinics.

57.     The Clinics willingly provided access to the PC Defendants in exchange for kickbacks because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by No-Fault insurance and therefore catered to high volumes of Insureds at the locations.

58.     The financial arrangements that Orenbakh and the PC Defendants entered into included the payment of fees ostensibly to "rent" space from the Clinics, however, in reality, these arrangements were actually "pay-to-play" arrangements.  In connection with these arrangements, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" to one of the PC Defendants, for psychological evaluation and testing, regardless of individual symptoms or presentations.

59.     In certain cases, the Clinic "representatives" making the referrals to the PC Defendants were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to the PC Defendants.

60.     In keeping with the fact, that the ostensibly legitimate "rent" payments by Orenbakh and the PC Defendants were actually disguised kickbacks in exchange for patient referrals, the amounts of the "rental" payments were far in excess of the legitimate, fair market value of the putative non-exclusive use of the clinic locations.

61.     In further keeping with the fact that the payments made by Orenbakh and the PC Defendants were actually disguised kickbacks in exchange for patient referrals, Orenbakh and the PC Defendants provided no legitimate or necessary services that warranted other providers at the Clinics to bring in Orenbakh and the PC Defendants to the Clinics to treat the patients.

62.     Orenbakh and the PC Defendants made the various kickback payments in exchange for having Insureds referred to the PC Defendants for the medically unnecessary Fraudulent

Services at the Clinics, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

63.     The unlawful kickback and referral arrangements were essential to the success of the Defendants' fraudulent scheme. The Defendants derived significant financial benefit from the relationships with the John Doe Defendants, because without access to the Insureds, the Defendants would not have had the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

64.     The Defendants at all times knew that the kickback and referral arrangements were illegal and therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

65.     In fact, Orenbakh decided to split the Defendants' billing for the Fraudulent Services across two separate entities – the PC Defendants – in order to reduce the volume of fraudulent billing submitted through any single entity using any single tax identification number, avoid detection, and thereby perpetuate the fraudulent scheme and increase the Defendants' ill-gotten gains.

### C.     The Defendants' Fraudulent Treatment and Billing Protocol

66.     Regardless of the nature of the accidents or the actual medical or psychological needs of the Insureds, the Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or history.

67.     Each step in the Defendants' fraudulent treatment and billing protocols was designed to falsely reinforce the previous step and provide a false justification for the subsequent

step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent No-Fault insurance billing for each Insured.

68.     What is more, the referrals made to the PC Defendants were made without regard for the necessity of the Fraudulent Services or the individual Insureds' symptoms, needs, or history.

69.     In certain instances, Insureds were directed to the PC Defendants by the non-medical staff at the Clinics, who advised the Insureds that psychology services were part of their treatment plan.

70.     The psychology services were medically unnecessary as: (i) they were provided pursuant to a fraudulent pre-determined protocol; (ii) the Insureds, in certain instances, were unaware of why or how they were referred to the PC Defendants; and (iii) the Fraudulent Services were provided pursuant to the improper referral and kickback agreements between the Defendants.

71.     No legitimate psychologist or healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

72.     The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from their fraudulent scheme.

### 1.     The Fraudulent Psychiatric Diagnostic Evaluation Charges

73.     Once an Insured was referred to Orenbakh and the PC Defendants, the PC Defendants purported to perform a psychiatric diagnostic evaluation.

74.     As set forth in Exhibits "1" and "2", the psychiatric diagnostic evaluation was then billed through the respective PC Defendant to GEICO under CPT code 90791 or 90801, usually

resulting in a charge of $254.78 or $194.58, separate and independent of the other psychological services that the Insureds purportedly received on the same date.

75.     The charges for the psychiatric diagnostic evaluations identified in Exhibits "1" and "2" were fraudulent in that the evaluations were medically and psychologically unnecessary, and were conducted, to the extent that they were conducted at all, pursuant to the improper financial agreements between the Defendants, and not pursuant to the documented and clinically reasonable needs of the Insureds.

76.     In addition, in the claims for the psychiatric diagnostic evaluations identified in Exhibits "1" and "2", the charges for the psychiatric diagnostic evaluations falsely represented that such evaluations were legitimately performed in the first instance.  Instead, the psychiatric diagnostic evaluations were performed to provide the Insureds with a series of predetermined "diagnoses" to justify the hours of medically unnecessary psychological testing, psychotherapy, and biofeedback services billed through the PC Defendants.

### a.     Basic, Legitimate Psychiatric Diagnostic Evaluations

77.     A psychiatric diagnostic evaluation is an integrated assessment whereby a mental health practitioner elicits patient data to establish a diagnosis and, if necessary, to formulate an individualized treatment plan for the patient.

78.     In a legitimate clinical setting, during a psychiatric diagnostic evaluation, the data necessary to establish a diagnosis and, if necessary, to form an individualized treatment plan for a patient, is elicited through a patient interview and mental status examination.

79.     The patient interview is a face-to-face encounter between the mental health practitioner and patient during which the practitioner observes the patient and elicits information

regarding the patient's chief complaint, medical history, psychological history, family history, and social history.

80.     The mental status examination is a structured assessment of the patient's behavioral and cognitive functioning. It includes descriptions of the patient's appearance and general behavior, level of consciousness and attentiveness, thought processes, mood and affect, thought and perception, insight and judgement, and higher cognitive function, including memory, intellect, attention, and concentration. Typically, some components of the mental status examination are obtained through observation and other components are obtained through questioning of the patient.

81.     In non-complex cases, a psychiatric diagnostic evaluation consisting of a patient interview and a mental status examination will typically elicit patient data sufficient to establish a diagnosis and, if necessary, to formulate an individualized treatment plan for that patient. In an atypical or complex case, where a patient interview and mental status examination results in a differential diagnosis rather than an established diagnosis, a mental health practitioner may choose to incorporate a simple self-administered or self-scored inventory, screening test, or other similar test to establish a diagnosis.

82.     The use of these simple types of inventories/tests are considered part of the evaluation service and are not separately payable as psychological testing.

**b.     The Medically Unnecessary Psychiatric Diagnostic Evaluations**

83.     In the claims identified in Exhibits "1" and "2", the large majority of Insureds did not suffer clinically significant psychological symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation was medically necessary.

84.     In a legitimate clinical setting, a psychiatric diagnostic evaluation is medically necessary when a patient has a psychological illness and/or is demonstrating emotional or behavioral symptoms which manifest in inappropriate behavior patterns or maladaptive functioning in personal or social settings, when a patient's baseline functioning is altered by suspected illness or symptoms, or when a patient exhibits a sudden and rapid change in behavior.

85.     In a legitimate clinical setting, the necessity of a psychiatric diagnostic evaluation is typically reflected in the "chief complaint" set forth in the patient's treatment report.

86.     The CPT Assistant defines the "chief complaint" as, "a concise statement describing the symptom, problem, condition, diagnoses, or other factor that is the reason for the encounter, usually stated in the patient's words." A "chief complaint" is a necessary component of any examination report.

87.     In keeping with the fact that, in the claims identified in Exhibits "1" and "2", the large majority of Insureds did not suffer clinically significant psychological symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation was medically necessary, virtually none of the Insured's treatment reports include a valid chief complaint.

88.     Rather, Orenbakh and the PC Defendants purportedly asked the Insureds to complete a self-administered "Personal Injury Questionnaire" which asked the Insureds to place a check mark next to a pre-printed list of seventeen (17) different symptoms that have appeared since they were involved in a motor vehicle accident.

89.     There is nowhere on the Personal Injury Questionnaire for a patient to write in any additional symptoms they may be experiencing.  For example:



90.     Nowhere, on the Personal Injury Questionnaire is a chief complaint listed. Rather,

at the end of each psychiatric diagnostic evaluation there is generic, boilerplate, fill in the blank,

language stating:

> Mr./Mrs. [Patient Name] is a [Patient Age] year old male/female with [blank] prior
> psychiatric history. Patient was involved in a motor vehicle accident on above
> mentioned date. Upon self-referral, patient completed a brief screening checklist
> "Personal Injury Questionnaire" the results of which substantiated the psychiatric
> evaluation. This brief self-administered screening tool was designed to identify
> those MVA survivors who were at risk of developing post-traumatic
> psychopathology and to provide early intervention. Upon the results of the
> screening process, patient was deemed appropriate to undergo an initial psychiatric
> assessment by participating in a face-to-face psychiatric interview.

91.     Boilerplate "chief complaints" are not valid chief complaints and they do not reflect

the medical necessity of the underlying psychiatric diagnostic evaluations.

92.    What is more, and also in keeping with the fact that in the claims identified in Exhibits "1" and "2" the large majority of Insureds did not suffer clinically significant psychological symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation was medically necessary, virtually all of the Insureds whom Orenbakh and the PC Defendants purported to treat were involved in minor automobile accidents.

93.    For example, in many of the claims identified in Exhibits "1" and "2" contemporaneous police reports indicated that the Insureds' accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents or injured at all.

94.    In addition, in many of the claims identified in Exhibits "1" and "2", the Insureds did not seek treatment at any hospital as a result of their accidents, and virtually all of the Insureds who did go to the hospital were briefly observed in the emergency room and then released after a few hours, typically with nothing more serious than a soft tissue injury diagnosis.

95.    It is extremely improbable that all Insureds developed substantially similar psychological issues from the minor motor vehicle accidents.

96.    It is even more improbable – to the point of impossibility – that this would occur over and over again, such that virtually every insured who received treatment through the PC Defendants would suffer substantially similar psychological issues or require a substantially identical course of psychological treatment.

97.    Similarly, it is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident who treated at a specific Clinic would routinely require psychological treatment as a result of a minor motor vehicle accident.

98.     Even so, and in keeping with the fact that the psychiatric diagnostic evaluations and subsequent psychiatric treatments were not medically or psychologically necessary and were performed pursuant to predetermined protocols designed to maximize profits, Orenbakh and Hazaq often provided psychiatric diagnostic evaluations to multiple Insureds involved in the same minor automobile accident at or about the same time.

99.     For example:

(i)     On August 7, 2020, two Insureds – MD and CR – were involved in the same minor automobile accident.  Thereafter, MD and CR both received psychiatric diagnostic evaluations from Hazaq on the exact same date, August 21, 2020.

(ii)    On July 27, 2021, two Insureds – NF and MAS – were involved in the same minor automobile accident.  Thereafter, NF and MAS both received psychiatric diagnostic evaluations from Hazaq on the exact same date, August 4, 2020.

(iii)   On March 6, 2020, two Insureds – NA and BB – were involved in the same minor automobile accident.  Thereafter, NA and BB both received psychiatric diagnostic evaluations from Hazaq on the exact same date, March 12, 2020.

(iv)    On June 13, 2021, two Insureds – IC and NS – were involved in the same minor automobile accident.  Thereafter, IC and NS both received psychiatric diagnostic evaluations from Hazaq on the exact same date, June 22, 2021.

(v)     On June 12, 2020, two Insureds – SB and KH – were involved in the same minor automobile accident.  Thereafter, SB and KH both received psychiatric diagnostic evaluations from Hazaq on the exact same date, August 24, 2020.

100.    These are only representative examples.

101.    In many of the claims identified in Exhibit "1", two or more Insureds who had been involved in the same minor underlying accident received psychiatric diagnostic evaluations from Hazaq at or about the same time.

### 2.    The Fraudulent Record Evaluation Charges

102.   Not only did the PC Defendants submit improper billing for the psychiatric diagnostic evaluations they purported to conduct, they also routinely "unbundled" the charges in order to maximize the billing they submitted or caused to be submitted to GEICO.

103.   For instance, for a substantial majority of the Insureds, on the same date the PC Defendants submitted charges for the psychiatric diagnostic evaluations, the PC Defendants submitted separate charges under CPT code 90885, typically resulting in a charge of $88.00 or $67.24. The use of CPT code 90885 represents that a psychologist conducted a "psychiatric evaluation of hospital records, other psychiatric reports, psychometric and/or projective tests, and other accumulated data for medical diagnostic purposes." The PC Defendants submitted these charges to GEICO despite the fact that the review and evaluation of the Insureds' medical and psychological records was necessary to, and already reimbursed as an element of, the Insureds' psychiatric diagnostic evaluation. In other words, the PC Defendants cannot conduct and bill for a psychiatric diagnostic evaluation, then bill separately for contemporaneously provided medical or psychological record reviews.

104.   In further keeping with the fact that the charges under CPT code 90885 for record review and evaluation was part of the Defendants' pre-determined treatment and billing protocol, the "Review of Medical Records" report accompanying the PC Defendants' billing virtually never said what records were actually reviewed. Rather, without listing any specific records reviewed, the "Review of Medical Records" report simply contained pre-printed language which stated, in sum and substance, that the medical records purportedly reviewed were the patients' medical file provided by the physician. However, neither the physician's name nor the specific medical records reviewed are ever listed.

### 3.     The Fraudulent "Psychological Testing" Charges

105.    On the same date that the Insureds in the claims identified in Exhibits "1" and "2" were purportedly subjected to a psychiatric diagnostic evaluation, the PC Defendants and Orenbakh purported to provide those same Insureds with a battery of needless psychological tests.

106.    The purported psychological testing was then billed to GEICO under multiple units of CPT code 96101, typically resulting in total charges of more than $480.00 per Insured for each date of service.

107.    Like the charges for the psychiatric diagnostic evaluations and record reviews, the charges for the psychological testing were fraudulent inasmuch as the psychological testing was medically and psychologically unnecessary, and was conducted, to the extent that it was conducted at all, pursuant to a pre-determined fraudulent treatment protocol and the kickback and referral arrangements between the Defendants, not pursuant to the documented and clinically reasonable needs of the Insureds, or to benefit the Insureds who supposedly were subjected to it.

108.    In keeping with the fact that the psychological testing was medically and psychologically unnecessary, virtually none of the Insureds suffered from any clinically significant symptoms as a result of their putative minor automobile accidents such that psychological testing would be medically necessary.

109.    Moreover, in a legitimate clinical setting, the psychiatric diagnostic evaluation is typically the only service necessary to formulate a diagnosis and treatment plan for non-complex psychological cases. Conversely, psychological testing is typically only indicated in complex psychological cases where, based on the clinical interview and mental status examination, the mental health practitioner legitimately develops a differential diagnosis, rather than an established diagnosis. In that case, the particular psychological testing administered should augment the

findings from the initial clinical interview and mental status examination in order to establish a diagnosis.

110.    In the claims for "psychological testing" that are identified in Exhibits "1" and "2", virtually none of the Insureds who purportedly were subject to psychological testing by the PC Defendants and Orenbakh presented with complex psychological symptoms. Rather, each Insured - to the extent they suffered any clinically significant psychological symptoms at all as a result of their putative automobile accidents – experienced an obvious precipitant (i.e., the underlying automobile accident) and developed the supposed psychological symptoms in response to the accident. In straightforward, non-complex cases such as these, the clinical interview and mental status examination portions of the psychiatric diagnostic evaluation are generally sufficient mechanisms for gathering the patient data necessary to formulate an individualized diagnosis.

111.    In addition, even if there was a legitimate need for the PC Defendants and Orenbakh to supplement the psychiatric diagnostic evaluations with psychological testing in order to formulate a diagnosis and treatment plan for an individual Insured – which there was not – as noted above, simple self-administered or self-scored inventories, screening tests, or other similar tests are considered part of the psychiatric diagnostic evaluation service and are not separately payable as psychological testing.

112.    In fact, the psychological tests for which the PC Defendants and Orenbakh submitted billing to GEICO, as identified in Exhibits "1" and "2", were nothing more than pre-printed symptom checklists and inventories.  The Insureds were invited to check off the psychological symptoms they were purportedly experiencing – thus providing the same information that any legitimate clinical interview and/or mental status examination would elicit.

113. In keeping with the fact that the purported "psychological testing" was performed pursuant to the Defendants' fraudulent treatment protocol and was not intended to elicit any information that would significantly affect the diagnosis or treatment of any Insured, the PC Defendants and Orenbakh, purported to provide an identical battery of psychological tests to virtually every Insured, without regard to any Insureds' individual circumstances or presentment. Specifically, Orenbakh and the PC Defendants purported to provide virtually every Insured with the following psychological tests:

(i) Posttraumatic Stress Diagnostic Scale ("PDS"): a forty-nine (49) item self-administered checklist intended to screen for the presence of PTSD in patients who have identified themselves as a victim of a traumatic event. A PDS typically takes 10-15 minutes to administer.

(ii) Beck Depression Inventory ("BDI"): a twenty-one (21) question self-report inventory used to evaluate the symptoms of depression. A BDI typically takes 10-15 minutes to administer.

(iii) Beck Anxiety Inventory ("BAI"): a twenty-one (21) question self-report inventory used to evaluate the symptoms of anxiety. A BAI typically takes 10-15 minutes to administer.

(iv) Pain Patient Profile ("PPP"): a brief self-report inventory designed to measure anxiety, depression, and somatization in patients presenting with pain. A PPP typically takes 10-12 minutes to administer.

114. By subjecting every Insured to these unnecessary tests, the PC Defendants and Orenbakh would submit excessive bills to GEICO for the purported hours of "psychological testing," racking up hundreds of dollars per Insured. For example:

(i) On April 29, 2021, Orenbakh purported to perform a psychiatric diagnostic evaluation of an Insured named JD for which billing was submitted to GEICO from Hazaq under CPT code 90791, resulting in a charge of $254.78. On that same date, Orenbakh purported to also conduct two (2) hours of psychological testing for which billing was submitted to GEICO from Hazaq under CPT code 96101, resulting in an additional charge of $483.52.

(ii)     On March 23, 2021, Orenbakh purported to perform a psychiatric diagnostic evaluation of an Insured named SH for which billing was submitted to GEICO from Hazaq under CPT code 90791, resulting in a charge of $254.78. On that same date, Orenbakh purported to also conduct two (2) hours of psychological testing for which billing was submitted to GEICO from Hazaq under CPT code 96101, resulting in an additional charge of $483.52.

(iii)    On July 2, 2020, Orenbakh purported to perform a psychiatric diagnostic evaluation of an Insured name EC for which billing was submitted to GEICO from Hazaq under CPT code 90801, resulting in a charge of $194.58. On that same date, Orenbakh purported to also conduct three (3) hours of psychological testing for which billing was submitted to GEICO from Hazaq under CPT code 96101, resulting in an additional charge of $553.92

(iv)    On March 18, 2021, Orenbakh purported to perform a psychiatric diagnostic evaluation of an Insured named GT for which billing was submitted to GEICO from Hazaq under CPT code 90791, resulting in a charge of $254.78. On that same date, Orenbakh purported to also conduct two (2) hours of psychological testing for which billing was submitted to GEICO from Hazaq under CPT code 96101, resulting in an additional charge of $483.52.

(v)     On March 17, 2022, Orenbakh purported to perform a psychiatric diagnostic evaluation of an Insured named KL for which billing was submitted to GEICO from Restart under CPT code 90791, resulting in a charge of $254.78. On that same date, Orenbakh purported to also conduct two (2) hours of psychological testing for which billing was submitted to GEICO from Restart under CPT code 96101, resulting in an additional charge of $483.52.

(vi)    On February 22, 2022, Orenbakh purported to perform a psychiatric diagnostic evaluation of an Insured named YC for which billing was submitted to GEICO from Restart under CPT code 90791, resulting in a charge of $254.78. On that same date, Orenbakh purported to also conduct two (2) hours of psychological testing for which billing was submitted to GEICO from Restart under CPT code 96101, resulting in an additional charge of $483.52.

(vii)   On March 24, 2022, Orenbakh purported to perform a psychiatric diagnostic evaluation of an Insured named JT for which billing was submitted to GEICO from Restart under CPT code 90791, resulting in a charge of $254.78. On that same date, Orenbakh purported to also conduct two (2) hours of psychological testing for which billing was submitted to GEICO

from Restart under CPT code 96101, resulting in an additional charge of $483.52.

(viii)    On January 31, 2022, Orenbakh purported to perform a psychiatric diagnostic evaluation of an Insured named WB for which billing was submitted to GEICO from Restart under CPT code 90791, resulting in a charge of $254.78. On that same date, Orenbakh purported to also conduct four (4) hours of psychological testing for which billing was submitted to GEICO from Restart under CPT code 96101, resulting in an additional charge of $967.04.

(ix)    On March 23, 2022, Orenbakh purported to perform a psychiatric diagnostic evaluation of an Insured named DM for which billing was submitted to GEICO from Restart under CPT code 90791, resulting in a charge of $254.78. On that same date, Orenbakh purported to also conduct two (2) hours of psychological testing for which billing was submitted to GEICO from Restart under CPT code 96101, resulting in an additional charge of $483.52.

(x)    On March 2, 2022, Orenbakh purported to perform a psychiatric diagnostic evaluation of an insured named NJ for which billing was submitted to GEICO from Restart under CPT code 90791 resulting in a charge of $254.78. On that same date, Orenbakh purported to also conduct two (2) hours of psychological testing for which billing was submitted to GEICO from Restart under CPT Code 96101, resulting in an additional charge of $483.52.

115.    These are only representative examples.

116.    In virtually all of the claims identified in Exhibits "1" and "2", Orenbakh and the PC Defendants submitted charges for multiple hours' worth of psychological testing on the same date that they purportedly administered a psychiatric diagnostic evaluation.

117.    In further keeping with the fact that the purported psychological testing was not intended to elicit any information that would significantly affect the diagnosis or treatment of any Insured, in nearly all cases the "results" of the purported psychological testing were virtually identical, showing that the Insureds scored "high" or "very high" on all tests administered, despite the fact that almost all of the Insureds were involved in minor automobile accidents. It is extremely unlikely – to the point of impossibility – that virtually all of the Insureds "treated" by

the PC Defendants and Orenbakh would legitimately score so high, so consistently. The psychological testing and purported scores were merely part of the fraudulent scheme to submit excessive billing to GEICO for the Defendants' profit.

118.   In fact, the results of the "psychological testing" were pre-determined in order to support a pre-determined diagnosis that would allow the Defendants to further their fraudulent scheme by subjecting the Insureds to unnecessary follow-up psychological appointments so that the PC Defendants and Orenbakh could continue to fraudulently bill GEICO for unnecessary services.

119.   Following the pre-determined psychological testing results, the PC Defendants and Orenbakh would virtually always provide the Insureds with one of the following "diagnoses": (i) Adjustment Disorder with Mixed Anxiety and Depressed Mood Due to Injuries from Accident; (ii) Adjustment Disorder with Depressed Mood Due to Injuries from Accident; or (iii) Adjustment Disorder with Anxiety Due to Injuries from Accident.

120.   Moreover, each psychological testing report included a "Revised Treatment Plan" for each Insured.  However, in further keeping with the fact that the services purportedly provided by Orenbakh and the PC Defendants were administered pursuant to a pre-determined protocol, the revised treatment plan was identical in virtually every report.

121.   Specifically, the "Revised Treatment Plan" in virtually every report states:

> The analysis of the result of [Insured's Name] psychodiagnostics evaluation strongly indicates towards the beneficial role of Brief Integrative Psychotherapy and Biofeedback training. Patient was provided with psychoeducation regarding the content of the therapy and importance of adherence to the treatment process. [He/She] accepted the finalized treatment plan and provided the informed consent for the treatment. In light of these factors, ***Brief Integrative Psychotherapy and Biofeedback training*** are recommended, which are detailed below. The medical necessity for ***medication management*** will be evaluated upon further clinical monitoring.

122.   The PC Defendants and Orenbakh, used the medically unnecessary and pre-determined psychological testing protocols as a vehicle to submit bills for hours of purported psychological testing to GEICO and to further their fraudulent scheme by recommending additional, unnecessary psychotherapy and biofeedback training, so that those bills could also be submitted to GEICO.

### 4.   The Fraudulent Psychotherapy Charges

123.   Based upon the fraudulent, pre-determined outcome of the psychological testing and diagnostic interview examinations, and the sham diagnoses, the PC Defendants and Orenbakh purportedly provided many Insureds with several psychotherapy sessions, typically over the course of several months.

124.   These psychotherapy sessions were usually billed by the PC Defendants under CPT codes 90832 (representing 30 minutes of treatment), 90804 (representing 20-30 minutes of treatment), or 90833 (representing 30 minutes of treatment performed in connection with evaluation services) and resulting in charges of $76.88 through $129.46 per Insured, per session.

125.   In keeping with the fact that the psychotherapy sessions were billed as part of a pre-determined protocol designed to maximize profits, Orenbakh and the PC Defendants typically submitted charges for psychotherapy purportedly provided on the same date that the Insureds received the above-described psychiatric diagnostic evaluations and psychological testing.

126.   In a legitimate clinical setting, a psychologist would not administer psychotherapy on the same date as the initial patient encounter unless the patient was in the midst of an active psychological crisis.

127.   However, virtually none of the Insureds treated by Orenbakh and the PC Defendants were in the midst of an active psychological crisis during the initial patient encounter

as demonstrated by the fact that: (i) virtually all of the Insureds received additional treatment modalities from other healthcare providers on the same date that they treated with Orenbakh and the PC Defendants; and (ii) virtually none of the Insureds were referred for psychiatric medication or to the emergency room.

128.   Like the charges for the psychological testing and psychiatric diagnostic evaluations, the charges for psychotherapy were fraudulent in that the psychotherapy was medically and psychologically unnecessary, and was conducted, to the extent that it was conducted at all, pursuant to the illegal kickback and referral arrangements between the Defendants.

**5.      The Fraudulent Biofeedback Training**

129.   In addition to the other Fraudulent Services, the PC Defendants purported to provide Insureds with multiple sessions of medically unnecessary biofeedback training for which the Defendants then billed GEICO either: (i) pursuant to CPT code 90901, typically resulting in charges of $73.86 for each "round" of biofeedback training that they purported to provide; or (ii) pursuant to CPT code 90876, typically resulting in charges of $173.00 or $132.15.

130.   As with the charges for other Fraudulent Services the charges for the biofeedback training are fraudulent in that the biofeedback training (i) was medically unnecessary and (ii) was performed – to the extent that it was performed at all –in furtherance of the Defendants' fraudulent treatment and billing protocols and pursuant to the improper referral and financial arrangements between the Defendants.

131.   Virtually every Insured who purportedly was subjected to biofeedback training did not have any clinically significant psychological symptoms arising from their putative automobile accidents such that biofeedback training was medically necessary.

132.    Biofeedback training is a process that enables an individual to learn how to change physiological activity in order to improve their health and performance.   In a legitimate biofeedback training session, patients are connected to precise instruments such as electromyographs, thermometers, electrodermographs, electroencephalographs, electrocardiographs, and the like, which are used to measure physiological activity such as brainwaves, heart function, breathing, muscle activity, and skin temperature. These instruments rapidly and accurately "feed-back" information to the patient, who uses the information, and the treating physician's interpretation of the information, to learn how to control his or her own bodily functions – for instance, to relax a certain muscle group. Over time, patients learn how to control these functions without the assistance of any equipment or healthcare provider.

133.    The goal of any legitimate biofeedback training course is to teach patients how to control their own bodily functions without using any instruments to provide feedback, and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

134.    Therefore, any legitimate biofeedback training course must include meaningful documentation of, among other things:

(i)     the indication for biofeedback training within the overall treatment plan – in other words, the specific symptom or problem that the biofeedback training is intended to address;

(ii)    the type of biofeedback training that is being provided – for instance, the specific bodily functions that the patient is being trained to control;

(iii)   the specific instruments used to obtain feedback regarding each patient's bodily functions;

(iv)    the readings, or feedback, provided by the instruments during each training session, and the extent to which the readings or feedback vary from session-to-session; and

(v)     the progress of the patient, or lack thereof, through the course of training.

135.    Though the PC Defendants submitted or caused to be submitted a multitude of charges for biofeedback training, what was purportedly done does not actually constitute biofeedback training. For instance, the biofeedback training sessions purportedly:

(i)     generally did not provide the Insured with any interpretation of any data regarding their bodily functions; and

(ii)    generally did not train the Insureds, in any way, to control their bodily function without using any instruments to provide feedback and without the assistance of any healthcare provider to interpret the feedback provided by the instruments.

136.    No meaningful documentation associated with the purported biofeedback service actually documents: (i) the extent to which the readings or feedback regarding the Insureds' bodily functions vary from session-to-session, (ii) any actual coaching or assistance that was provided to the Insureds with respect to controlling their bodily functions, or (iii) the specific symptom or problem that the biofeedback training is intended to address. Indeed, the form used to document biofeedback training sessions simply record data in a meaningless way and contain no notes or other interpretive information to permit: (i) the monitoring of the Insureds' progress through the biofeedback training course, or (ii) adjustment to the training course, in order to achieve the ultimate goal of teaching the Insureds how to control their own bodily functions without using any instruments.

137.    The reason for this is simple, the biofeedback training was medically unnecessary in the first instance and was never designed or intended to do anything other than support fraudulent charges submitted to GEICO and other insurers.

138.    Moreover, as set forth above Orenbakh and the PC Defendants also often billed for biofeedback training pursuant to CPT code 90876, which typically resulted in charges of either $173.00 or $132.15.

139.    Orenbakh and the PC Defendants submitted charges under CPT code 90876 for purported "individual psychophysiological therapy incorporating biofeedback training by any modality, with psychotherapy", which purportedly lasted 45 minutes.

140.    To support their charges under CPT code 90876, the PC Defendants submitted boilerplate one (1) page treatment progress notes on a pre-printed, check-list form.

141.    Like the other charges for the Fraudulent Services, the charges under CPT code 90876 for psychophysiological therapy sessions that incorporated biofeedback were fraudulent in that: (i) they were provided pursuant to the Defendants' fraudulent, pre-determined protocol and pursuant to the improper referral and financial arrangements between the Defendants; (ii) the Insureds were, in certain cases, unaware of why they were referred to the PC Defendants in the first instance; and (iii) the sessions never lasted 45 minutes, to the extent they were conducted at all.

142.    Like the charges for the other Fraudulent Services, the biofeedback services were performed for the sole purpose of submitting charges to GEICO and to justify the laundry list of Fraudulent Services being rendered by the Defendants at the Fraudulent No-Fault Clinics.

### III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

143.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, HCFA-1500 forms, and treatment reports through the PC Defendants to GEICO seeking payment for services for which the Defendants were not entitled to receive payment.

144.    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

> (i)    The NF-3 forms, HCFA-1500 forms and supporting documentation submitted by and on behalf of the Defendants uniformly misrepresented to

GEICO that the Fraudulent Services were medically necessary.  In fact, the Fraudulent Services, to the extent provided at all, were not medically necessary and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)     The NF-3 forms, HCFA-1500 forms, and treatment reports, submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the nature and level of the Fraudulent Services that purportedly were provided; and

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

## IV.     The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

145.     Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

146.     To induce GEICO to promptly pay the fraudulent charges for the healthcare services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

147.     Specifically, the Defendants knowingly misrepresented and concealed facts related to the PC Defendants in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

148.     Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were performed pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

149.     Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

150.     The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

151.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $568,000.00 based upon the fraudulent charges.

152.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### AS AND FOR A FIRST CAUSE OF ACTION
**Against Orenbakh and the PC Defendants**
**(Declaratory Judgement – 28 U.S.C. §§ 2201 and 2202)**

153.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

154.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $160,000.00 in fraudulent billing for the psychological services that have been submitted to GEICO.

155.    Orenbakh and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

156.    Orenbakh and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

157.    Orenbakh and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback payments paid for patient referrals.

158.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Orenbakh and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the PC Defendants.

## AS AND FOR A SECOND CAUSE OF ACTION
### Against Orenbakh
### (Violation of RICO, 18 U.S.C. § 1962(c))

159.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

160.     Hazaq is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affected interstate commerce.

161.     Orenbakh knowingly has conducted and/or participated, directly or indirectly, in the conduct of Hazaq's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Hazaq was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) Hazaq obtained its patients through the Defendants' illegal kickback scheme.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

162.     Hazaq's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Orenbakh operated Hazaq, inasmuch as Hazaq never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Hazaq to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Hazaq to the present day.

163.    Hazaq is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Hazaq in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

164.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $532,000.00 pursuant to the fraudulent bills submitted by the Defendants through Hazaq.

165.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
**Against Orenbakh and The John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

166.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

167.    Hazaq is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affected interstate commerce.

168.    Orenbakh and the John Doe Defendants are employed by and/or associated with the Hazaq enterprise.

169.    Orenbakh and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Hazaq's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking

payments that Hazaq was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) Hazaq obtained its patients through the Defendants' illegal kickback scheme.  The fraudulent bills and corresponding mailings submitted to GEICO that compromise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

170.    Orenbakh and The John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

171.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $532,000.00 pursuant to the fraudulent bills submitted by the Defendants through Hazaq.

172.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<u>**AS AND FOR A FOURTH CAUSE OF ACTION**</u>
**Orenbakh and Hazaq**
**(Common Law Fraud)**

173.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

174.    Orenbakh and Hazaq intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

175.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Hazaq was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Hazaq and Orenbakh; and (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.

176.    Orenbakh and Hazaq intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Hazaq that were not compensable under the No-Fault Laws.

177.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $532,000.00 pursuant to the fraudulent bills submitted through Hazaq.

178.    Orenbakh and Hazaq's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

179.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
**Against Orenbakh and Hazaq**
**(Unjust Enrichment)**

180.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

181.     As set forth above, Orenbakh and Hazaq have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

182.     When GEICO paid the bills and charges submitted by or on behalf of Hazaq for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Orenbakh and Hazaq's improper, unlawful, or unjust acts.

183.     Orenbakh and Hazaq have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Orenbakh and Hazaq voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

184.     Orenbakh and Hazaq's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

185.     By reason of the above, Orenbakh and Hazaq have been unjustly enriched in an amount to be determined at trial, but in no event less than $532,000.00.

## AS AND FOR A SIXTH CAUSE OF ACTION
**Against The John Doe Defendants**
**(Aiding and Abetting Fraud)**

186.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

187.    The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Orenbakh and Hazaq.

188.    The acts of the John Doe Defendants in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Hazaq in exchange for illegal kickbacks from Orenbakh and Hazaq and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

189.    The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Orenbakh or Hazaq to obtain referrals of patients at the Clinics, subject those patients to medically unnecessary services, and obtain payment from GEICO and other insurers for the Fraudulent Services.

190.    The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Orenbakh and Hazaq for medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

191.    The conduct of the John Doe Defendants caused GEICO to pay more than $532,000.00 pursuant to the fraudulent bills submitted through Hazaq.

192.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

193.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A SEVENTH CAUSE OF ACTION
**Against Orenbakh and Restart**
**(Common Law Fraud)**

194.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

195.    Orenbakh and Restart intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

196.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Restart was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Orenbakh and Restart; and (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.  The fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

197.     Orenbakh and Restart intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Restart that were not compensable under the No-Fault Laws.

198.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $36,000.00 pursuant to the fraudulent bills submitted through Restart.

199.     Orenbakh and Restart's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

200.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Against Orenbakh and Restart
### (Unjust Enrichment)

201.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

202.     As set forth above, Orenbakh and Restart have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

203.     When GEICO paid the bills and charges submitted by or on behalf of Restart for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Orenbakh and Restart's improper, unlawful, or unjust acts.

204.     Orenbakh and Restart have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Orenbakh and Restart voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

205.    Orenbakh and Restart's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

206.    By reason of the above, Orenbakh and Restart have been unjustly enriched in an amount to be determined at trial, but in no event less than $36,000.00.

**AS AND FOR A NINTH CAUSE OF ACTION**
**Against The John Doe Defendants**
**(Aiding and Abetting Fraud)**

207.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

208.    The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Orenbakh and Restart.

209.    The acts of the John Doe Defendants in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Restart in exchange for illegal kickbacks from Orenbakh and Restart and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

210.    The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Orenbakh or Restart to obtain referrals of patients at the Clinics, subject those patients to medically unnecessary services, and obtain payment from GEICO and other insurers for the Fraudulent Services.

211.    The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Orenbakh and Restart for medically unnecessary,

illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

212.    The conduct of the John Doe Defendants caused GEICO to pay more than $36,000.00 pursuant to the fraudulent bills submitted through Restart.

213.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

214.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

215.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co., demand that a Judgement be entered in their favor:

A.    On the First Cause of Action against Orenbakh and the PC Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Orenbakh and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO through the PC Defendants;

B.    On the Second Cause of Action against Orenbakh, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $532,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Orenbakh and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$532,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Orenbakh and Hazaq, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $532,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Orenbakh and Hazaq, more than $532,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $532,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Orenbakh and Restart, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $36,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Orenbakh and Restart, more than $36,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

I.      On the Ninth Cause of Action against the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $36,000.00

together with punitive damages, costs, interest, and such other and further relief as this Court

deems just and proper.

Dated: December 28, 2022

RIVKIN RADLER LLP


By:____/s/ Barry Levy_____
        Barry I. Levy, Esq.
        Michael A. Sirignano, Esq.
        Sean Gorton, Esq.
        Ashley N. Prinz, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*